**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**v.**                        **Case No. 2:22-CR-00007-LPR-1**

**ANDREW BUTLER**                                               **DEFENDANT**

## ORDER

    This Order resolves Andrew Butler's Motion to Suppress.[1]  After full briefing, the Court held a suppression hearing.[2]  At that hearing, the Court heard from four fact witnesses called by the Government.  Through counsel, Mr. Butler questioned each witness.  Mr. Butler called three fact witnesses of his own.  And the Government cross-examined each of them.  After the close of evidence, counsel for both parties presented legal arguments.  The Court's findings of fact are based on the testimony given, and the exhibits admitted, at the suppression hearing.  The Court's conclusions of law are based on its findings of fact as well as the legal arguments presented in writing and orally by the parties.  Ultimately, the Court concludes the Suppression Motion should be DENIED in its entirety.

### Findings of Fact

    Pursuant to Supreme Court precedent, the Court relies on a preponderance-of-the-evidence standard to resolve factual disputes underlying the instant Motion.[3]  Generally, that means that an alleged fact is established if it is more likely than not to have occurred.[4]  Even where this Order

---

[1] Doc. 55.

[2] *See* Dec. 11, 2023 Hr'g Tr. (Rough).

[3] *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

[4] *See, e.g.*, *United States v. Soileau*, 686 F.3d 861, 867 (8th Cir. 2012) ("[P]reponderance of the evidence simply means it is more likely than not that an event occurred . . . .").

does not expressly say so, any of the findings of fact that resolve disputed factual issues should be read to include an implicit determination that the evidence contrary to the particular finding was overborne by the evidence supporting the particular finding.

There is a complicating quirk here. Different parties bear the burden of proof for different portions of the Fourth Amendment analysis. And which party bears the burden of proof on a particular dispute of fact depends on which part of the Fourth Amendment analysis is implicated by that fact. So, for example, Mr. Butler has the burden of proof to establish the legitimate expectation of privacy necessary to assert a Fourth Amendment challenge to the law enforcement conduct at issue here.[5] Correspondingly, he has the burden of proof on facts that are relevant to that analysis. On the other hand, assuming arguendo that Mr. Butler demonstrates the necessary legitimate expectation of privacy, the Government then has the burden of proof to establish that the law enforcement conduct at issue here was constitutional.[6] Correspondingly, the Government has the burden of proof on facts that are relevant to that analysis.[7]

Here's how the facts shake out in light of the appropriate burdens.

---

[5] *See United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) ("The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search.") (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995)); *United States v. Perez*, 700 F.2d 1232, 1236 (8th Cir. 1983) ("The touchstone of a standing requirement to assert a [F]ourth [A]mendment challenge is whether the individual had a legitimate expectation of privacy in the area searched."). Caselaw often refers to what Mr. Butler is required to show as standing. *See, e.g.*, *Mancusi v. DeForte*, 392 U.S. 364, 367–69 (1968); *Jones v. United States*, 362 U.S. 257, 265 (1960) (overruled on other grounds). True, the Supreme Court has instructed us that "the type of standing requirement discussed in" the older cases "is more properly subsumed under substantive Fourth Amendment doctrine" and "the better analysis" therefore "forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment[] rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). Still, even decades after *Rakas*, the Eighth Circuit has treated the legitimate-expectation-of-privacy requirement as a species of standing. *See United States v. Rodriguez-Arreola*, 270 F.3d 611, 616–17 (8th Cir. 2001).

[6] *Cf. United States v. Luken*, 515 F. Supp. 2d 1020, 1032 (D.S.D. 2007), *aff'd*, 560 F.3d 741 (8th Cir. 2009).

[7] If a particular factual dispute goes to both parts of the Fourth Amendment analysis, the Court will determine whether the potential burden shift matters to the resolution of the fact dispute.

1.        A little after midnight on March 21, 2022, Jasmine Spates placed a 911 call.[8]

2.        Almost immediately upon connection, Ms. Spates requested that police come quickly to 2306 Goodwin Avenue, Apartment 142.[9]  Unintelligible male voices could be heard in the background.  Ms. Spates said, "I need police right now, please."[10]  She then whispered to the operator: "a gun, a gun."[11]  Muffled female and male voices could be heard for several seconds.[12]  Ms. Spates then said, "[unintelligible] just left his job,"[13] and "I'm so through with him."[14]

3.        After this, Ms. Spates identified herself to the operator as Jasmine Spates.[15]  And she identified Andrew Butler as the man about whom she was calling.[16]  She informed the operator that Mr. Butler had, at that point, left her apartment.[17]  She confirmed with the operator that Mr. Butler left in a vehicle—"he is in a gold Chevy Impala."[18]  And she added, "I live in an apartment complex, he just left out of here."[19]

4.        During the 911 call, law enforcement officers were dispatched to 2306 Goodwin Avenue, Apartment 142, in reference to a domestic situation and a subject with a gun.[20]  At least

---

[8] *See* Ex. 1 to Def.'s Mot. to Suppress (Doc. 56); *see also* Dec. 11, 2023 Hr'g Tr. (Rough) at 17, 26–27.

[9] *See* Ex. 1 to Def.'s Mot. to Suppress (Doc. 56) at 00:07–00:13.

[10] *See id.* at 00:39.

[11] *See id.* at 00:45.

[12] *See id.* at 00:58.

[13] *See id.* at 1:00.

[14] *See id.* at 1:25.

[15] *See id.* at 1:48.

[16] *See id.* at 1:53.

[17] *See id.* at 2:12.

[18] *See id.* at 2:25–27.

[19] *See id.* at 2:40–45.

[20] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 17–18, 27.  During the 911 call, the 911 operator could be heard reporting to a third party that the incident involved a "subject with a gun, Andrew Butler."  *See* Ex. 1 to Def.'s Mot. to Suppress (Doc. 56) at 2:04–2:08.

one officer got there within a few minutes.[21]  Indeed, near the end of the call, the operator told

Ms. Spates that officers had arrived and asked if she would go make contact with them.[22]

5.     Officer Gregory Bowman, a West Memphis patrolman, was the first officer on

scene in response to the 911 call.[23]  He was informed by dispatch that a gold Chevy Impala had

left the apartment complex.[24]  As he turned into the apartment complex, he saw a silver Chevy

Impala.[25]  Despite the color difference, he took a mental note of the car's make and model.[26]

6.     When Officer Bowman arrived at the ground-level apartment, he noticed that the

front door was slightly ajar.[27]  The doorframe above the locking mechanism looked to Officer

Bowman as if it had been splintered by a forcible entry.[28]  And the locking mechanism itself was

bent.[29]

7.     Ms. Spates was the only person in the apartment.[30]  She told Officer Bowman that

Andrew Butler (her ex-boyfriend and the father of her children) had forced himself into her

apartment.[31]  She reported that while Mr. Butler had a gun when he kicked in her door, he held it

by his side; he never pointed it at her.[32]

---

[21] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 28.

[22] *See* Ex. 1 to Def.'s Mot. to Suppress (Doc. 56) at 2:48–51.

[23] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 15, 17, 22.

[24] *See id.* at 18, 28.

[25] *See id.* at 28.

[26] *See id.* at 18, 28.

[27] *See id.*

[28] *See id.* at 19.

[29] *See id.*  Officer Bowman (and Sergeant Bracey, who will be discussed later) observed a bullet hole in the front window of the apartment.  *See id.* at 21, 47.  But Ms. Spates explained that the bullet hole pre-dated the March 21, 2022 incident.  *See id.* at 22.

[30] *See id.* at 19–20.

[31] *See id.* at 20.

[32] *See id.* at 21.  Officer Bowman recalled that Ms. Spates changed her story "several times" about the gun but ultimately clarified that Mr. Butler never pointed the gun at her.  *See id.*

8.      Ms. Spates reported that she and Mr. Butler had argued during the entirety of the incident.[33]  She also said that Mr. Butler never physically touched her.[34]

9.      Ms. Spates said that, during the altercation, a man named Denarius Payne was also inside the apartment.[35]  Mr. Payne was not there when Officer Bowman arrived, and there is no evidence that any officer spoke to Mr. Payne that evening.[36]  Mr. Payne's involvement in the altercation and his relationship to the parties involved was unclear to the officers who responded to the scene.[37]

10.      Officer Bowman called his supervisor, Sergeant Thomas Bracey, to relay what he had learned from Ms. Spates and to discuss the police report that would come out of his investigation.[38]  At the time, Sergeant Bracey directly supervised a group of patrolmen, including Officer Bowman.[39]

11.      While inside the apartment, Officer Bowman observed items that Ms. Spates confirmed belonged to Mr. Butler.[40]  Officer Bowman photographed the apartment scene with a

---

[33] *See id.*

[34] *See id.* at 25, 37.

[35] *See id.* at 22, 47–48.

[36] *See id.*

[37] *See id.* at 47–48.

[38] *See id.* at 22–23.

[39] *See id.* at 45–46.  Sergeant Bracy also oversaw Officer Johnson and Trainee Officer Odom.  *See id.* at 46, 75.  The only other officer involved in the sequences of events at issue in this Motion to Suppress is Detective Cecil Langston.  *Id.* at 122.  Although Sergeant Bracey was not Langston's chain-of-command supervisor, Sergeant Bracy had supervisory authority over Langston on the scene(s) involved in this case.  *See id.* at 46.

[40] *See id.* at 33.

department-issued camera.[41]  Officer Bowman no longer has the photographs that he took.[42]  He also has no explanation of where the photographs are.[43]

12.     At around 12:30 a.m., Sergeant Bracey (and Trainee Officer Odom) arrived at the apartment scene and spoke with Ms. Spates and Officer Bowman.[44]  Ms. Spates told Sergeant Bracey that she believed Mr. Butler had gone back to his place of employment at the Altium Packaging plant located at 1234 North 7th Street.[45]

13.     At this time, Sergeant Bracey was independently aware that Mr. Butler was a convicted felon and had some outstanding misdemeanor warrants and a second-degree battery conviction.[46]  Sergeant Bracey also knew that Mr. Butler had a warrantless search waiver on file.[47]  The waiver read:  "You must submit your person, place of residence, motor vehicles, and/or any other area or property under your control to search and seizure at any time, day or night, with or without a search warrant by any Arkansas Community Correction Officer or any other certified law enforcement officer."[48]

14.     Sergeant Bracey and Officer Bowman discussed the potential of an aggravated residential burglary charge given the events Ms. Spates had reported.[49]

---

[41] *See id.* at 29.

[42] Officer Bowman does not know where the photographs are, but he recalled that the photographs were logged in with his report back at the police station.  *See id.* at 30.

[43] *See id.*

[44] *See id.* at 47–48.  Trainee Officer Odom appears to have been riding with Sergeant Bracy.  *See id.* at 49.  *See also id.* at 52 (arriving "at about 12:30" in the morning).

[45] *See id.* at 49.

[46] *See id.* at 46.  Detective Langston corroborated the existence of at least one outstanding misdemeanor warrant.  *See id.* at 148.  Mr. Butler never disputed the validity of the misdemeanor warrants.

[47] *See id.* at 47.

[48] *See* Ex. 1 (probation conditions) to Gov't Opp. to Def.'s Mot. to Suppress (Doc. 62-1) at 3.

[49] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 23, 32, 48–49.

15.     At the request of Sergeant Bracey, another officer—Detective Cecil Langston—went to the Altium facility to try and find Mr. Butler's car.[50]  Sergeant Bracey made plans with Detective Langston to meet at the Altium plant to try to find Mr. Butler.[51]  Sergeant Bracey specifically directed Detective Langston to (if possible) locate Mr. Butler's vehicle at Altium.[52]

16.     Detective Langston arrived at the Altium plant around 12:55 a.m.[53]  He was the first and only officer at the Altium plant at that time.[54]

17.     Detective Langston observed a Chevy Impala parked to the left of the Altium plant's front entrance.[55]  He parked behind the vehicle and ran its tag.[56]  The tag returned to the same address the police had for Mr. Butler.[57]

18.     Detective Langston also ran Mr. Butler's driver's license information through dispatch and learned that Mr. Butler was on probation with a warrantless search waiver on file.[58]

---

[50] *See id.* at 24, 122, 125.  The sequence of communication between Sergeant Bracey and Detective Langston is not entirely clear.  Neither is it clear whether and for how long Detective Langston was on-scene near Ms. Spates's apartment.  These ambiguities are not material, and so the Court does not resolve them.  Additionally, these ambiguities appear to be the product of normal mis-recollections that understandably come with the passage of time.  Neither the ambiguities nor the underlying inconsistent testimony from which they spring are significant enough to cause the Court to doubt the credibility of the remainder of the officers' testimonies.

[51] *See id.* at 24.  Since it was close to the end of his shift, Officer Bowman decided to return to the police station.  *Id.*  He never made it there.  While en route to the police station, he was dispatched to Altium with a call of "shots fired."  *See id.* at 35.  Although Officer Bowman eventually ended up at the Altium facility, it was after the events at issue in this Motion to Suppress occurred.  *See id.*

[52] *See id.* at 49 ("I sent Detective Langston to see if he could locate the vehicle . . . .").  *See also id.* at 125–26.

[53] *See id.* at 125.  *See also id.* at 128 (estimating his arrival at "around 12:55" a.m.).

[54] *See id.* at 127.

[55] *See id.* at 125, 149–50.

[56] *See id.* at 126.

[57] The address listed on Mr. Butler's identification was Ms. Spates's address.  *See id.* at 52 ("[I]t returned to the same address that he has on his identification.").  *See also id.* at 126 ("I[t] returned to the woman but the same address that rushed to Butler.").  *See also id.* at 144 (recalling that the tags returned to a female but to the same address that Mr. Butler had on file).

[58] *See id.* at 147.

19.     Detective Langston radioed Sergeant Bracey to report that he had located the Chevy Impala.[59]  Detective Langston reported that (looking through the windows) he had not seen a gun inside the car.[60]  Sergeant Bracey directed Detective Langston to wait for him.[61]

20.     Sergeant Bracey (with Trainee Officer Odom in tow) arrived at the Altium plant around 1:00 a.m.[62]  So at this point Bracey, Odom, and Langston were all at Altium together.[63]

21.     Unsurprisingly given the time of night, it was dark outside.[64]  The officers walked around the Chevy Impala and looked inside the vehicle through its windows.[65]  They did not see a firearm in plain view.[66]  They did see "empty alcohol containers."[67]

---

[59] *See id.* at 50, 128.

[60] *See id.* at 50–51.

[61] *See id.* at 51.

[62] *See id.* at 52 ("I think that we went to Altium either right before or around 1:00.").  *See also id.* at 128 ("I think . . . 1 a.m. around 1 a.m. he arrived when I advised him I found the vehicle.").

[63] There is a stray reference or two in the trial testimony suggesting that an Officer Johnson was also on-scene at Altium during the events at issue in this Motion to Suppress.  However, those stray references appear to be the product of attorney-witness miscommunication and are clarified by a holistic reading of the trial transcript.  *Compare id.* at 24, 46, 82, *with id.* at 57–58, 83, 85–86.

[64] *See id.* at 53.

[65] *See id.* at 52, 144–45.

[66] *See id*.  Aside from a few pictures, there is no record evidence (testimonial or otherwise) of what the parking lot was like.  There is no record evidence concerning the features of the entrance to the parking lot.  There is no record evidence concerning whether Altium had signs restricting entry to the parking lot in any way.  The only marginally relevant record evidence is that Altium had a system in place for non-employees to enter the building—at least during normal business hours.  The reasonable inference from that evidence is that the parking lot was not restricted to employees.  In any event, the specific features of the parking lot are largely immaterial.  Mr. Butler does not argue that the Constitution was violated by the officers' entry into the parking lot or the plain-view search of the car.  It is the officers' entry into the facility, and the search therein, that Mr. Butler challenges.  *See id.* at 259, 263–67.

[67] *Id.* at 52.

22.     Although Detective Langston had heard about Mr. Butler before, he did not know what Mr. Butler looked like.[68]  So the officers conducted a Justice Exchange search to find a photograph of Mr. Butler.[69]

23.     Sergeant Bracey placed a Stop Stick behind the tire of the Chevy Impala to prevent Mr. Butler from fleeing in the vehicle.[70]

24.     The officers approached the Altium building and went directly to the door pictured in Government Exhibit 11.  They believed this door to be the front entrance to the building.[71]  In fact, however, it was the employees' entrance.[72]

25.     The front entrance—meaning where non-employees would enter the facility—is depicted in Defendant's Exhibit 5 and Government Exhibit 12.  It is fairly close to the employees' entrance.  In the dark, the officers did not see the front entrance door.[73]  If they had gone through that door, which is always unlocked, they would have immediately encountered a glass window, a locked door, and a guest check-in iPad.[74]  They would not have been able to get beyond this area without employee assistance.[75]

---

[68] *See id.* at 53 ("Just to make sure everybody knew what Mr. Butler looked like in case we came across him due to the fact that he could be armed and dangerous.").  *See also id.* at 128, 147.

[69] *See id.* at 52–53, 147.

[70] *See id.* at 79–80 (explaining that they placed the Stop Stick because the department had a no vehicle pursuit policy, and the officers were not allowed to chase a fleeing vehicle).  *See also id.* at 146 (describing the Stop Stick as a "plastic thing with [a] sharp object inside it so when pressure hit[s] it goes through the tire").

[71] *See id.* at 54, 149–50.

[72] *See id.* at 180.  *See also id.* at 183 (identifying that the employee entrance was locked and only employees had special access through use of a key fob).  There is no evidence that any of the officers had previously been to the facility or otherwise were familiar with the facility's layout.

[73] *See id.* at 55 (recalling that on the morning of the shooting, the exterior of the Altium facility "looked a little different in the dark" than the photographs in Government Exhibits 11 and 12).

[74] *See id.* at 179.

[75] *See id.*  Persons other than Altium employees could be and sometimes were invited onto the production floor.  *See id.* at 185.  These persons were mainly businesspeople (contractors, salesmen, etc.) as opposed to members of the public.  *See id.*  Although employees like Mr. Butler were empowered to momentarily stop non-employees from being

26.     The door that the officers tried first—the employees' entrance that the officers incorrectly believed to be the front entrance—was unlocked.[76]   Unbeknownst to the officers, however, that door was supposed to be locked and only accessible by way of a key fob given to each employee.[77]   In any event, Sergeant Bracey pulled the door open, and the officers entered the building.[78]

27.     Upon entry, the officers directly faced a hallway wall that displayed award placards.[79]   The wall they faced can be seen in Government Exhibit 11.   To their left was a hallway lined with what Sergeant Bracey correctly concluded were the Altium management offices.[80]

28.     While Detective Langston and Trainee Officer Odom waited just inside the employee entrance door, Sergeant Bracey looked for management personnel inside each office.[81]

---

on the production floor, employees like Mr. Butler could not ultimately control who was allowed onto the production floor and who was not.   That authority rested with management alone.   *See id.* at 192–94.

[76] *See id.* at 53–54.   According to the Altium Plant Manager, this door is to be always locked if it is functioning correctly.   *See id.* at 191–92.   Altium employees, including Mr. Butler, accessed the facility using their Altium-issued key fob.   *See id.* at 207–08, 222.

[77] *See id.* at 183, 201, 207–08, 222.   Government Exhibit 11 shows a stick-on decal on the door glass that reads:  "NO ADMITTANCE: RING BELL FOR SERVICE."   *See* Gov't Ex. 11.   The sign is a little bit smaller than a standard piece of printer paper.   *Id.*   The sign is in red, black, and white.   *Id.*   Exhibit 11 was taken at some unidentified point after the date of the incident at issue here.   We know that because it is light outside in the photograph, whereas the incident occurred in the wee hours of the morning.   In any event, the officers say they did not see the sign on the door. And there is no clear testimony that this specific sign was on the door when the officers opened it.   (There is specific testimony that a different sign, related to guns, was on the door when the officers opened it.   *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 184).   The Court concludes that (1) either the sign was not on the door when the officers opened it, or (2) the officers did not see the sign in the dark.

[78] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 54.

[79] *See id.* at 191 ("Straight when you walk in is just . . . safety award[s] and plaques as you walk straight into [the entryway].").   *See also id.* at 220 (clarifying that Government Exhibit 11 accurately depicts the front entryway with the award placards on the entryway wall).

[80] *See id.* at 54 ("[T]here is a hallway going down to my left with office doors.").   *See also id.* at 150–51 ("We went to the door that goes straight to the office to the left-hand side so when you walk in it's nothing but offices [t]here.").

[81] *See id.* at 54, 82, 85, 152 ("I went to each office[] trying to find supervision and was unable to find any.").   *See also id.* at 129 ("We went to the office to each office building door to check and see if any management or anybody [was] in the office.   Nobody was there until we made it to the like[,] to the site[,] to the floor[,] main floor.").

He did not find anyone.[82]  So he returned to where Detective Langston and Trainee Officer Odom were waiting.

29.     To the right of the award placards (which, again, were hanging on the wall across the hall from the employee entrance door) was another door that opened to the production floor.[83] You can just make out this door on the right side of Government Exhibit 11.  After Sergeant Bracey showed a photo of Mr. Butler to Detective Langston and Trainee Officer Odom, the three officers approached this door, found it unlocked, and walked through it single file.[84]  Detective Langston was the first to go through the door, then Sergeant Bracey, and then Trainee Officer Odom.[85]  They were now on the production floor.[86]

30.     At this time, Sergeant Bracey was wearing a bulletproof vest with his nametag and badge sewn into the vest, over a uniform shirt with shoulder patches.[87]  Detective Langston was in plain clothes and wearing (over his clothes) a bulletproof vest with POLICE written in large letters across the front and back of the vest.[88]  Trainee Officer Odom was wearing a traditional-style police uniform with a badge and nametag sewn onto his shirt, and he had on a vest under the shirt.[89]

31.     Voris Keith, Adrick Walker, and Mr. Butler were the only three Altium employees working the night shift.[90]  (Their shift ran from 11:00 p.m. to 7:30 a.m.[91])  Mr. Keith was the

---

[82] *See id.* at 54.

[83] *See id.* at 153.

[84] *See id.* at 54, 82–83, 155.

[85] *See id.* at 82–83, 155.

[86] *See id.* at 82–83, 153, 155.

[87] *See id.* at 83–84.

[88] *See id.* at 84.

[89] *See id.*

[90] *See id.* at 188, 195, 209–10.

[91] *See id.* at 210.

night-shift maintenance supervisor.[92]  Mr. Walker and Mr. Butler were both working as palletizers and operating machines on the production floor.[93]

32.     The three Altium employees (including Mr. Butler) were wearing safety glasses, ear plugs, and hard hats.[94]  The production floor was somewhat loud—loud enough for ear plugs to be required protective gear.[95]

33.     Like all Altium employees, these three employees were not permitted to have personal items on the production floor.[96]  However, there was an unofficial exception to this rule for cellphones.  Mr. Butler had his cellphone on his person.[97]

34.     Mr. Butler was the first person that the officers encountered on the production floor.[98]  And they encountered him very shortly after coming through the door.[99]

35.     At this point, Mr. Butler was about 15 to 20 yards away from the officers.[100]  He was turned away from the officers in whole or part, such that he didn't see them upon their entrance.[101]

---

[92] *See id.* at 196.

[93] *See id.*  Palletizers build and/or wrap pallets.  *See id.* at 224–25.

[94] *See id.* at 211.

[95] *See id.* at 211–12.  The sound of machines on the production floor was loud but the officers could still hear each other.  *See id.* at 153.

[96] *See id.* at 218 ("Other than a cellphone or something there is no other personal items allowed on the floor, no.").  *See also id.* at 214 ("Well, the rule states that we're not supposed to but you know we give leniency as long as your line is running fine[,] I don't care what you're doing.").

[97] *See id.* at 214.

[98] *See id.* at 154.

[99] *See id.*

[100] *See id.* at 63.

[101] *See id.* at 154 ("He had his back turned toward us he was on the side facing this way[,] he was facing this way[,] we w[ere] walking this way.").

36.     Mr. Butler appeared to be operating a machine, but his hands were free.[102]  He was wearing a jacket.[103]

37.     Detective Langston shouted two orders to Mr. Butler in quick succession.[104]  The orders were generally of the "stop, Police" or "you're under arrest" variety.[105]  Mr. Butler looked at the officers for a second or two.[106]  But, by the time the second order was given, Mr. Butler began to back away.[107]  The officers drew their service pistols into a low ready position because they believed that Mr. Butler was armed and not complying with the orders.[108]

38.     Sergeant Bracey noticed that Mr. Butler's jacket pocket was hanging heavy.[109]  Based upon his training and experience, Sergeant Bracey believed that Mr. Butler had a firearm or some other weapon in his pocket.[110]

39.     As he backed away, Mr. Butler grabbed his jacket pocket.[111]  Mr. Butler's jacket pocket started swinging and, because Detective Langston believed it was swinging as if there was a firearm inside, he yelled, "Gun!"[112]  Detective Langston did not actually see a gun at that time.[113]

---

[102] *See id.* at 154–55.

[103] *See id.* at 94, 154.

[104] *See id.* at 60 ("Detective Lang[ston] handled the announcing.  He identified us as police and told [Mr. Butler] to stop and come to us.").  *See also id.* at 156 ("I said police or you're under arrest so he can hear me[,] acknowledge me[,] or something."); *id.* at 212 (Mr. Butler's coworker testified that he "could hear it was some yelling it was basically almost like they w[ere] shouting commands or whatever, but they were yelling").

[105] *See id.* at 60, 156, 212.

[106] *See id.* at 60.

[107] *See id.* at 156.  *See also id.* at 137 ("No he started backing away when I[,] after I said to[,] said something to him the second time.").

[108] *See id.* at 60–62.  In this position, their weapons were pointed at the ground but held close to their sternums.  *See id.* at 61.

[109] *See id.* at 69.

[110] *See id.* at 70.

[111] *See id.* at 132.

[112] *See id.* at 132, 156–57.

[113] *See id.* at 156.

40.     Mr. Butler turned around and took off running.[114]   With his firearm drawn, Detective Langston chased after Mr. Butler.[115]  It is not entirely clear, but the evidence suggests it is more likely than not that, during the subsequent chase, Detective Langston again communicated to the other officers that he believed Mr. Butler had a gun because the object in Mr. Butler's pocket was "swinging and [Detective Langston] could [thus] tell [that Mr. Butler] had a firearm on his person during the chase[.]"[116]   Ultimately, it is not material whether Detective Langston yelled "gun" only once or more than once during the entire episode at issue in this suppression motion.

41.     Mr. Keith (one of the other Altium employees on the production floor) witnessed the chase.   Moments prior, Mr. Keith had been clearing a jam on the production line for Mr. Butler.[117]  As he was walking away from helping Mr. Butler, Mr. Keith heard loud "hooting and hollering and yelling."[118]  Mr. Keith turned around and saw three guns pointed at Mr. Butler.[119]

42.     Mr. Keith did not see Mr. Butler with a gun; he recalled seeing Mr. Butler holding his cellphone in his hand.[120]

43.     While running away, Mr. Butler ran by Mr. Keith.[121]  In fact, Mr. Butler grabbed Mr. Keith to get around him and kept running.[122]

---

[114] *See id.* at 157.  *See also id.* at 212 ("And that's when . . . Mr. Butler turned around he just he took off running for his life.").

[115] *See id.* at 157.

[116] *Id.* at 132.

[117] *See id.* at 212.

[118] *See id.*

[119] *See id.*

[120] *See id.* at 214.

[121] *See id.* at 61.

[122] *See id.* ("I believe there were two other employees present[,] one of which he pushed in front of us while he was running.").  *See also id.* at 215.

44.     Mr. Keith heard someone say, "he has a gun," so Mr. Keith dove toward the ground.[123]

45.     When the officers ran past Mr. Keith, Mr. Keith saw a gold badge hanging from the pants pocket of one of the officers.[124]  It was then that Mr. Keith realized the men with guns were law enforcement officers.[125]  He also observed an officer run past him wearing a jacket with POLICE written on the back.[126]

46.     At this point, Mr. Butler was some distance ahead of Detective Langston.[127] Mr. Butler rounded a corner and Detective Langston lost sight of him.[128]  Soon thereafter, Detective Langston rounded the same corner.[129]  Government Exhibit 4 partially captures the path taken by Mr. Butler and Detective Langston.  It does not show the corner they rounded—the corner with an obstructed view.  That corner is apparently just outside of the frame of the photograph on the top-right side.[130]  Once Mr. Butler made a left turn around the corner, he was facing and running towards the center-bottom of the photograph.

47.     As Detective Langston turned the corner, he saw Mr. Butler in the process of picking up a gun from the floor.[131]  Detective Langston advised Mr. Butler to drop the gun.[132]

---

[123] *See id.* at 215.

[124] *See id.* at 213.

[125] *See id.* at 215.

[126] *See id.* at 213.  Despite this, Mr. Keith said that "there was no way from telling just looking at [the last officer] that a[t] that particular time they w[ere] police officers . . . ."  *Id.*

[127] *See id.* at 65.

[128] *See id.* at 131.

[129] *See id.* at 89.

[130] *See id.* at 107–09.

[131] *See id.* at 133.  *See also id.* at 134 ("I seen him picking up the gun.  He was picking a gun up his hand was already.").  Detective Langston did not see Mr. Butler drop the gun.  *Id.*

[132] *See id.* at 133.  Detective Langston yelled, "drop the gun."  *Id.* at 132.

When Mr. Butler did not comply—that is, when Mr. Butler continued to pick up the gun—Detective Langston fired four shots.[133]  The other officers had not yet rounded the corner.[134]

48.     Mr. Butler, gun in hand, dove into an empty alcove created by three sides of oil pallets that were sitting on the floor.[135]  This space can be seen in Government Exhibit 9.  Detective Langston would have been firing from off the right-hand side of the photograph towards the left-hand side of the photograph.

49.     Sergeant Bracey caught up with Detective Langston before they reached a point where they could see Mr. Butler in the alcove into which he had dove.[136]

50.     Once they got their eyes on Mr. Butler, they saw that he was lying prone, face-forward on the ground.[137]  Mr. Butler's hands were to his sides.[138]  Sergeant Bracey directed Detective Langston to cover Mr. Butler so that Sergeant Bracey could flank around to where he could confirm that Mr. Butler's hands were empty.[139]  Mr. Butler was handcuffed and placed under arrest.[140]  The entire foot pursuit—from start to finish—occurred in under a minute.[141]

51.     When Detective Langston and Sergeant Bracey got to Mr. Butler, Mr. Butler did not have a gun on his person.  Neither Detective Langston nor Sergeant Bracey saw how Mr. Butler ended up without the gun.[142]  Detective Langston looked under the nearby pallets and saw the gun

---

[133] *See id.* at 89, 158.  Mr. Keith heard gunshots, but he did not see who fired a weapon.  *See id.* at 216.

[134] *See id.* at 89 (recalling that both Sergeant Bracey and Trainee Officer Odom were still behind Detective Langston and did not have eyes on Mr. Butler).

[135] *See id.* at 134.  *See also id.* at 138.

[136] *See id.* at 134.

[137] *See id.*

[138] *See id.* at 66–67.

[139] *See id.*

[140] *See id.* at 66, 137.

[141] *See id.* at 135 ("I would say quick[,] 15 or 20 seconds.").

[142] *See id.* at 138.

lying on the ground.[143]  He had to bend down to see the gun. [144]  By that time, Trainee Officer Odom was also in the general area.  Specifically, Trainee Officer Odom was on the other side of the pallets, and he also saw the gun.[145]  The gun was lying on the ground between two pallets (but not underneath either pallet) in a direct line from where Mr. Butler was lying.[146]  The gun's location can be seen in Government Exhibits 7 and 8.

52.     When Mr. Butler was lying prone, Sergeant Bracey had a vantage point from which he could see the gun in plain view.[147]  Detective Langston had to bend down from his vantage point to see the gun.[148]  But he didn't move around enough to know if he could have seen the gun from a different vantage point while standing upright.[149]

53.     There are two potentially reasonable interferences concerning how the gun ended up where it did:  first, that Mr. Butler intentionally tried to dispose of the gun after he drove into the alcove; and second, that he unintentionally dropped the gun as he was diving into the alcove. For reasons explained in the discussion below, the choice between these two inferences is not material, and so the Court does not resolve this dispute.

---

[143] *See id.*

[144] *See id.* at 141.

[145] *See id.* at 138.

[146] *See id.* at 70.

[147] *See id.* at 67–68, 98.

[148] *See id.* at 140–41.

[149] *See id.* at 159.

54.      At or around this point in time, Mr. Keith called the Altium Plant Manager, Steve Petti.[150]  Mr. Petti was not at the facility at the time of the shooting.[151]  But he arrived on the scene approximately half an hour later.[152]

55.      Officer Johnson responded to the scene after shots fired were reported at the Altium plant.[153]  He responded to secure the scene before the state police arrived to process the scene and collect evidence.[154]

56.      Arkansas state police processed the scene.[155]  White stickers were used at the scene to mark bullet holes in the pallets.[156]  Markers numbered 1 through 4 were placed on the floor to mark where the shell casings fell.[157]  The Court finds this to be a true and accurate representation of what the scene looked like after the shooting.

57.      Law enforcement seized the firearm at the scene.[158]  The firearm was rendered safe before it was packaged as evidence.[159]

58.      Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Steven Blakely obtained the firearm from the West Memphis Police Department's Evidence Custodian.[160]

---

[150] *See id.* at 178, 216.

[151] *See id.* at 184, 195.

[152] *See id.* at 201.

[153] *See id.* at 85.

[154] *See id.* at 86.

[155] *See id.* at 111.  Some photographs have been admitted as Government Exhibits 5–9.  *See* Gov't Exs. 5–9.

[156] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 110–12.

[157] *See id.*

[158] *See id.* at 168; Gov't Exs. 13, 15, 16.

[159] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 169.

[160] *See id.* at 165.

59.     Special Agent Blakely test fired the gun.[161]  With a single pull of the trigger, the gun ejected a bullet, but it also jammed.[162]  Despite the jam, Special Agent Blakely determined that the gun operated as designed, as he was still able to fire two more bullets after the gun jammed.[163]

60.     Special Agent Blakely identified the gun seized by the officers as the same gun photographed in Government Exhibits 13, 15, and 16.[164]

61.     The Arkansas state lab processed the firearm and identified a latent fingerprint near the base of the handgun's magazine.[165]

62.     After the firearm was processed, Special Agent Blakely received a report from the state lab.[166]  The report identified the latent fingerprint as belonging to Mr. Butler.[167]  To identify Mr. Butler as the source of the fingerprint on the magazine, the lab compared the latent fingerprint to an Automated Fingerprint Identification System (AFIS) fingerprint on record for Mr. Butler.[168]

63.     Special Agent Blakely was only aware of one fingerprint, and that was the fingerprint on the firearm's magazine.[169]

64.     The state lab also processed the firearm for DNA, but according to the lab report, there were too many DNA contributors on the firearm to isolate a single DNA source.[170]

---

[161] See id.

[162] See id.

[163] See id.

[164] See id. at 164, 167–68.

[165] See id. at 168–69; Gov't Ex. 14 (picture of back of fingerprint card).

[166] See Dec. 11, 2023 Hr'g Tr. (Rough) at 169.

[167] See id.

[168] See id. at 175–76.

[169] See id. at 174.

[170] See id. at 176.

## Conclusions of Law

Mr. Butler challenges "the warrantless entry" into the Altium plant, the search for him in the plant, his subsequent arrest in the plant, and the search for and seizure of the gun in the plant.[171] Ultimately, Mr. Butler wants this Court to prevent the Government from introducing at trial the gun and the fingerprint evidence found on the gun. Mr. Butler's arguments are not entirely frivolous. The police entered a private business after hours without a search warrant, without consent of the owners, and (in this Court's view) without exigent circumstances. But, under binding precedent, Mr. Butler still loses. And that is because, as the Government argues,[172] he lacks the necessary legitimate expectation of privacy to challenge the entry into the Altium plant—the only constitutionally dubious step taken by law enforcement in this case.

It is well settled that "Fourth Amendment rights are personal rights that may not be asserted vicariously."[173] Accordingly, an individual's Fourth Amendment challenge to law enforcement conduct is doomed to fail unless that individual can show the invasion of some legitimate expectation of privacy that he had.[174] And, in undertaking that threshold analysis, it is important to remember two things. First, the Fourth Amendment does not protect all subjective expectations of privacy; rather, it protects "only those expectations that society is prepared to recognize as reasonable."[175] The expectation must be "one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are

---

[171] *See* Def.'s Mot. to Suppress (Doc. 55) at 5, 10.

[172] *See* Gov't Resp. in Opp'n to Def.'s Mot. to Suppress (Doc. 62) at 6–10.

[173] *United States v. Long*, 797 F.3d 558, 568 (8th Cir. 2015) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)) (internal quotation marks omitted).

[174] *See Perez*, 700 F.2d at 1236; *O'Connor v. Ortega*, 480 U.S. 709, 715–16 (1987) (explaining that Fourth Amendment rights are implicated when a warrantless search infringes an expectation of privacy that society is prepared to consider reasonable).

[175] *Oliver v. United States*, 466 U.S. 170, 177 (1984) (internal quotation marks and alterations omitted) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).

recognized and permitted by society.'"[176]  Second, the Fourth Amendment "protects people, not places."[177]  After all, the language of the Amendment speaks of "[t]he right of the people to be secure *in their* persons, houses, papers, and effects against unreasonable searches and seizures[.]"[178]  So, while the extent to which the Fourth Amendment protects a person may in part depend upon where that person is,[179] the ultimate question is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy" that has been invaded.[180]

Under this rubric, Mr. Butler lacks the legitimate expectation of privacy necessary to challenge law enforcement's presence in the Altium facility.  To understand why, we need to consider four binding lines of precedent from the Eighth Circuit.  The first line teaches that a person "cannot claim any greater Fourth Amendment protection in [a third party's] home than he possessed in his own home."[181]  The second line teaches that, although a person "can have a reasonable expectation of privacy in commercial premises," the expectation is "less than . . . a similar expectation in [that] individual's home."[182]  The third line teaches that a valid arrest warrant—whether it is a felony arrest warrant or a misdemeanor arrest warrant—"carries with it the authority to enter the residence of the person named in the warrant in order to execute the

---

[176] *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143 n.12.

[177] *Katz*, 389 U.S. at 351.

[178] U.S. CONST. amend. IV (emphasis added).

[179] *Carter*, 525 U.S. at 88.

[180] *See id.* (quoting *Rakas*, 439 U.S. at 143).

[181] *United States v. Glover*, 746 F.3d 369, 373 (2014) (quoting *United States v. Kaylor*, 877 F.2d 658, 663 (8th Cir. 1989)); *see also United States v. Clifford*, 664 F.2d 1090, 1092–93 (8th Cir. 1981).

[182] *United States v. Lewis*, 864 F.3d 937, 941 (2017) (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)).

warrant."[183]   And the fourth line teaches that law enforcement's awareness of an outstanding warrant is enough to justify entrance into the person's residence to arrest the person.[184]

So let's put these lines of precedent together and apply them to the case at hand.  The first two lines of precedent must mean that Mr. Butler can assert no greater Fourth Amendment protection in the Altium facility than he could in his own home.  Indeed, he likely can't even assert an equal level of protection.  And the latter two lines of precedent mean that, had Mr. Butler been in his home instead of the Altium facility, the Fourth Amendment would not have prevented law enforcement from entering his home to arrest him.  That is because law enforcement knew of a live misdemeanor arrest warrant for Mr. Butler and had good reason to believe he was there.[185] Mr. Butler certainly "cannot claim any greater Fourth Amendment protection in the" Altium facility "than he possessed in his own home."[186]

It should also not be forgotten that, in addition to one or more outstanding arrest warrants, law enforcement also knew—prior to entry into the Altium facility—that Mr. Butler was on

---

[183] *See United States v. Clayton*, 210 F.3d 841, 843 (8th Cir. 2000).

[184] *See Clifford*, 664 F.2d at 1093 n.6 ("Although the arresting officers did not actually possess the federal warrant during the entry and arrest, one of the officers knew of an outstanding warrant for Clifford's arrest for his failure to appear to serve a sentence.  Under these circumstances, the officers did not need to possess the actual warrant.  Their awareness of that warrant, the validity of which has not been challenged, justified the police entry.") (internal citation omitted) (citing *United States v. West*, 517 F.2d 483, 485 (8th Cir. 1975).  This, of course, makes complete sense given that, under the Fourth Amendment, we judge the constitutionality of law enforcement conduct from an objective perspective as opposed to considering the subjective motivations of a particular law enforcement officer.  *Cf. Graham v. Connor*, 490 U.S. 386, 397 (1898) (identifying that, in the context of the Fourth Amendment, inquiries into police conduct are "objective one[s]," where "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation") (citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978) and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *Walden v. Carmack*, 156 F.3d 861, 869 (8th Cir. 1998) ("Under the 'objective legal reasonableness standard,' courts are not permitted to investigate the subjective motivation of the law enforcement officer.") (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

[185] Recall that: (1) Ms. Spates had told officers that Mr. Butler went back to work at Altium after the incident at her home; (2) in the Altium parking lot, law enforcement located the same type of car that Mr. Butler was alleged to have been driving; and (3) when law enforcement ran the car's license plate, the returned information linked the car to Mr. Butler.

[186] *Kaylor*, 877 F.2d at 663.

probation and thus had a search waiver on file.  That search waiver gave law enforcement officers the right to conduct warrantless searches and seizures of Mr. Butler's "person" and "place of residence."  And while the language of the waiver appears to justify even suspicionless searches and seizures, in this case law enforcement had probable cause—from Ms. Spates's statement—to believe Mr. Butler had committed aggravated residential burglary and possession of a firearm by a felon.  Had Mr. Butler been in his home instead of at the Altium facility, the Fourth Amendment would not have protected him from law enforcement entering his home to arrest him (or to search the home).  Once again, Mr. Butler "cannot claim any greater Fourth Amendment protection in the" Altium facility "than he possessed in his own home."[187]

Because Mr. Butler cannot show the legitimate expectation of privacy necessary to successfully challenge law enforcement's entry into or presence in the Altium facility—whether on the plant floor or anywhere else—this case becomes much more mundane.  While Mr. Butler can challenge his own arrest (aside from where it took place), he cannot possibly prevail on such a challenge.  The first time that Mr. Butler was seized for purposes of the Fourth Amendment was when he lay prostrate on the floor after diving into an alcove created by several columns of pallets on the plant floor in an effort to avoid getting shot by law enforcement.  Before that point, none of the law enforcement officers had laid hands on Mr. Butler, and Mr. Butler had not submitted to whatever assertions of authority (i.e., explicit or implicit commands to stop or otherwise give oneself up) had come from the law enforcement officers.  The Supreme Court has been entirely

---

[187] *See id.*  The Court acknowledges that the principle set forth here could be seen—at least superficially—to be in some tension with the Eighth Circuit's decision in *United States v. Thabit*, 56 F.4th 1145, 1149–50 (8th Cir. 2023). But, in *Thabit*, the issue of whether one can claim greater protection in the home of a third party (or somewhere else) than he can claim in his own home does not appear to have been directly raised or directly addressed.  And the only way to read *Thabit* in harmony with prior Eighth Circuit cases like *Glover*, 746 F.3d at 373, *Kaylor*, 877 F.2d at 663, and *Clifford*, 664 F.2d at 1092, is to conclude that *Thabit* was not addressing this issue.

clear that "either physical force . . . or . . . submission to the assertion of authority" is a prerequisite to finding a Fourth Amendment seizure.[188]

Law enforcement may "arrest someone without a warrant if the officer has probable cause to believe the person has committed a crime."[189]  Officers have probable cause when, upon the totality of the circumstances, the "facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."[190]  By the time Mr. Butler's arrest was effectuated, law enforcement officers had probable cause to believe Mr. Butler had committed multiple felonies: aggravated residential burglary, fleeing, and possession of a firearm by a felon.  They had Ms. Spates's statement.  One officer saw what he reasonably thought was Mr. Butler's car leaving the apartment complex close in time to the 911 call.  The officers watched Mr. Butler flee after at least one of them told him to stop.  One officer saw Mr. Butler pick up a gun he had apparently dropped while fleeing.  Add to this that law enforcement knew of at least one active arrest warrant for him, knew of the search-and-seizure waiver related to his ongoing probation, and knew of his status as a felon.  Excluding the location of the arrest—for the reasons already set forth in detail above—there's nothing even slightly problematic about an arrest under these circumstances.

But what about the seizure of the gun that was on the floor between two pallet columns following Mr. Butler's arrest?  To the extent Mr. Butler is claiming this act is an independent

---

[188] *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphases omitted).  If any of the shots fired by Detective Langston had struck Mr. Butler, he would have been seized at that point.  *See Torres v. Madrid*, 592 U.S. 306, 318 (2021) ("We therefore conclude that the officers seized Torres for the instant that the bullets struck her.").  But none did.  If Mr. Butler had given up when Detective Langston began firing, he would have been seized at that point.  But Mr. Butler did not do so.  He dove away in a continued attempt to evade.  It was only after that dive, once Mr. Butler decided to remain prostrate on the floor, that Mr. Butler can be said to have submitted to an assertion of law enforcement authority.

[189] *United States v. Slim*, 34 F.4th 642, 646 (8th Cir. 2022).

[190] *See id.*

24

constitutional problem, his claim cannot survive the Scylla and Charybdis of Fourth Amendment law.  On one hand, the gun could be considered abandoned.  If Mr. Butler intentionally threw the gun away from his person, that clearly qualifies as abandonment under binding precedent.[191]  And he cannot claim the protection of the Fourth Amendment in property that is no longer his.[192]  On the other hand, because it is unclear whether Mr. Butler threw the gun away or simply dropped it while diving into the alcove, let us assume for a moment the gun was not abandoned and was still the property of Mr. Butler.  In that case, Mr. Butler's Fourth Amendment challenge fails because of his probation search-and-seizure waiver.  As part of his terms of probation, Mr. Butler agreed to "submit . . . property under [his] control to search and seizure at any time, day or night, with or without a search warrant by any Arkansas Community Correction Officer or any other certified law enforcement officer."[193]

The search-and-seizure waiver simultaneously diminishes Mr. Butler's legitimate expectation of privacy in the gun and enhances law enforcement's justification for securing and seizing the gun.[194]  In this case, where (1) law enforcement had a veritable cornucopia of cause to believe that the gun belonged to Mr. Butler and was contraband insofar as Mr. Butler was possessing it while being a felon, (2) law enforcement saw, in plain view during the foot chase, Mr. Butler pick up the gun even after an officer commanded him not to do so, (3) the gun was found almost immediately after Mr. Butler was arrested, was found relatively close to spot where Mr. Butler was arrested, and was in plain view of at least one of the officers, and (4) other

---

[191] *See, e.g.*, *Hodari D.*, 499 U.S. at 623–24, 629; *United States v. Richardson*, 537 F.3d 951, 957 (8th Cir. 2008).

[192] *See id.*

[193] Ex. 1 to Gov't Opp. to Mot. to Def.'s Mot. to Supp. (Doc 62-1) at 3.

[194] *See, e.g.*, *Samson v. California*, 547 U.S. 843, 848–56 (2006); *United States v. Knights*, 534 U.S. 112, 114–20 (2001).

employees were still on the plant floor, the seizure of the gun was reasonable in light of the search-and-seizure waiver.[195]

The last challenge Mr. Butler makes is to the use of fingerprint evidence from the gun.[196] But his challenge to the use of this evidence was predicated on the alleged unconstitutionality of his seizure and/or the search for the gun.[197]  He argues that the fingerprint (and actually the gun too) is fruit of the poisonous tree.[198]  Given the Court's conclusion that there was no poisonous tree, there can be no fruit of such a tree.  Mr. Butler's fruit-of-the-poisonous-tree argument necessarily fails.

## CONCLUSION

For the reasons stated above, the Court DENIES the Motion to Suppress (Doc. 55) in its entirety.

IT IS SO ORDERED this 24th day of April 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[195] To the extent Mr. Butler argues that a search-and-seizure waiver doesn't justify searches and seizures in a probationer's place of work, that argument fails for the same reason that the illegal entry argument fails.  The owners, managers, or even other employees of Altium might be able to press such an argument if the gun was to be introduced against them at a trial or if they were suing the officers in a § 1983 action.  *Lewis*, 864 F.3d at 941–42.  But Mr. Butler can't.  As already discussed above, he may not claim more protection at the Altium facility than he could claim in his own home, and he would not have a righteous objection to the search and seizure of the gun in his own home if the same events had occurred there.  *See supra* pages 21–22.

[196] Def.'s Mot. to Suppress (Doc. 55) at 11.  *See also* Dec. 11, 2023 Hr'g Tr. (Rough) at 242–43.

[197] *See* Dec. 11, 2023 Hr'g Tr. (Rough) at 242–43.

[198] *See id.* at 242–44.